at all, oral argument not to exceed 15 minutes per side, Ms. Masseron for the appellants. May it please the Court, Mary Masseron on behalf of the defendant appellants, the Genesee County deputies, I'd like to reserve four minutes for rebuttal. This morning we urged the Court to reverse the District Court's denial of the defendant's motion for summary judgment. And there are two issues before the Court, one relating to excessive force, the other relating to a Fourth Amendment malicious prosecution claim. The key points on which we believe a reversal is in order are that the force used here was reasonable in light of the continued active physical resistance which included biting a deputy. I know we take a segmented approach in this jurisdiction, in this circuit, but if we do that, explain to me how in your view the use of force in the takedown was appropriate. The use of force in the takedown was appropriate because Jennings had been instructed to keep his hands on the wall and be looking forward. The deputy and even the plaintiff concedes that he took his hand off, albeit the plaintiff wants to give an explanation, well he was startled by the pat down in his crotch area. But the explanation really doesn't... My concern, I guess, is that if we're looking at a question of excessive force, which pretty generally means that you're looking at some relative things here, if you watch the video, you can discern that his hand comes down somewhat, and you can discern that he turns his head, but that is sufficient to require one, then two, then three really big guys to take him down to the floor? I mean, he was kind of a scrawny fellow. Well, the district court made that point about the relative size, but keep in mind, and this is apparent from the video, it was one, two, three guys, it was more than that trying to get control of him. No, no, no, I'm not talking about after the takedown. Okay. I'm just trying to figure out from watching that video how a guy who's been instructed to put his hands on the wall, and maybe he was instructed to keep his head facing forward and his forehead virtually against the wall, I don't know, because you can't hear that on the video, but he was instructed to put his hands on the wall. That video doesn't show much movement at all on his part before he is just violently taken to the floor, and I'm just trying to figure out why is that degree of force at that point, looking at that segment, why is that appropriate? Given the deputy's understanding of who he was and the crimes that they thought he had been involved in when he was arrested. What crimes did they think he'd been involved in? Shooting a weapon after a fight, suggesting him to have been quite violent, and they thought he was, they could see that he was high, they understood from information that, the police understood from information or thought that he might have been on cocaine, which of course is associated with very intense reactivity, and alcohol as well. So we get to look at, we have the video, but there were things that occurred before that, so when we're talking about what the police thought, do we get to look at the fact that the police also said that he wasn't violent, I mean they said he was uncooperative, but it's also clear from the entirety of that part of the record that the problem started only during the booking process, so up until then they hadn't had any, that the record reflects any particular problem with the guy, and then all of a sudden he moves one hand in his face and bam. Well, I guess I would say two things. The first is the fact that somebody is moving along and is compliant at one point and then becomes non-compliant, and that person is thought to have been involved in an angry fight and shooting and whatever, is enough to suggest that the officers are going to be on their extra guard. They're viewing this as a person who is capable of violence, and in addition to that, once somebody engages in some behavior which makes the officers think there's a problem, their reaction is very speedy. You can call it violent in the sense of being forceful and quick, and that's for a reason. The reason is because they are trained, as they must be, to immediately take control of the situation, otherwise it can get further out of hand, people can be injured, other problems arise, and so when you're in a jail setting, that it seems to me is reasonable. I understand the impetus for the questioning, and I know that was troubling to the district court. I guess the real problem I'm having here is looking at the video, and at that part of the video, I'm not talking about what happened later, I'm talking about that part of the video, whether it is really the case that there's no factual issue about the defendant's conduct and his actions sufficient to say a jury gets to decide whether that degree of force was excessive. In our view, the answer to that is no, for the reasons I've given, but let me move on, I'm watching my time here. Please do, I've taken too much of it. No, no, not at all. To what is important for the court to understand, and which was not adhered to below on his grounds for reversal, we believe there should be a reversal as to all of the defendants. We believe given the potential for violence and the non-compliance. Well, the potential for violence was that a neighbor said he was involved in shots, but at the time any arguable excessive force began, the officers had taken him into custody, and they'd had a period of time to observe him, and he certainly didn't have a weapon at that point, and he was a little guy. I think, it seems to me a couple things are really important about that. The first is, when you take someone into custody who has engaged in, as far as you know, erratic, violent activity, shooting a weapon, having a fight, going to a neighbor's house, demanding to be let in, things like that, it is completely reasonable, even if the person has been compliant, to be on your extra guard if the person starts to be non-compliant. And that's particularly true with someone who is intoxicated, whether it's alcohol or cocaine or whatever, because people who are in that state, particularly people with anger management issues, as someone might call them, are erratic. They behave in erratic ways. What was he arrested for? DUI. He was arrested, I want to check the record because I don't want to say the wrong thing. I thought it was DUI, I don't think. I think all these other things were part of his arrest, but they may have suspected that. The call came because of the neighbor and the shooting. He was arrested for DWI. Okay. DUI and some. I apologize for not remembering precisely, and that's why I didn't. It's hard to see. You know, of course, they're fact questions. We have no jurisdiction over this case. And it's hard to see how one couldn't view this video as the officer's conduct having been excessive at the very beginning, at the point when he momentarily removed his hand and looked around. And then you have to view everything else that happened afterwards in light of that. And the whole thing seems rather extreme on the part of officers. And if I can think it's rather extreme, a reasonable juror could think it's rather extreme. And so I really am not sure that we have a basis for finding any jurisdiction over this appeal. The court has jurisdiction when there are not fact questions. Well, the point was it's pretty hard to conclude that there are no fact questions in this case. Well, the facts are clear. The legal conclusions that you draw from the facts. I think Cohn didn't think they were clear because he thought there were times when the officers had moved in such a way to shield the view of what happened on the video. Let me address the question about the timing and what happened after. Let's assume the court does not agree with my position, although I stand by it, with respect to the initial takedown, which this court has held on more than one occasion for verbal disagreement, noncompliance, passive and active resistance is appropriate, in which is what the officers did. But if this court... I don't think my questions were directed to was a takedown appropriate. My questions are directed to is there a genuine issue with regard to the force used to accomplish the takedown under the circumstances, which caused the officers to take him down to begin with? It seems to me that the takedown, when you call it a takedown, you're talking about the force. That is the fact that individuals are grabbing hold of someone and moving that person to the floor. That's a takedown. And so the question is whether the takedown was appropriate in light of his removing a hand and turning his head. Even if the court doesn't agree with respect to that, and we believe it was appropriate, then you have other officers who come into the room seeing a struggle and who come to the assistance. And there's a whole stream of activity, which even the district court admits involves active resistance, repeated resistance, nine minutes of resistance at this point, more resistance at that point. And those officers are entitled to come to the aid of the officer. They cannot be held liable for coming into a room where an officer and a prisoner are engaged in an altercation and essentially serving as judge and jury about whether the impetus for this altercation was appropriate on the first two officers' part. They're entitled to accept that and to act appropriately. Thank you. Thank you. Good morning. Dean Elliott on behalf of William Jennings. I'd like to start by pointing out to the court that the arresting officer did not call ahead to warn about alleged violence on behalf of Mr. Jennings. He did not transmit any of the information regarding the alleged shots. That was a double hearsay statement from someone, a neighbor. None of that information was conveyed to the Deputy Fuller or Kenamar, who were booking Mr. Jennings. So they did not have that information when they took him to the ground. They did not have any information that he was intoxicated by cocaine. In fact, multiple medical tests prove that he was not. But he was intoxicated. He had a .12 alcohol level, yes, .12 BAL, and he was arrested for OUI in Michigan. So at the time, I guess the initial point I want to address is I don't believe that this court has jurisdiction over the appeal. The defendant's brief argues the facts at every turn, and as cited in the brief, the case law is very clear that where there are contested facts in a qualified immunity appeal, the defendants, or the appellants, pardon me, are supposed to accept the facts in the light most favorable to the non-moving party, in this case, Plaintiff Jennings. Their facts in the brief contradict the video and put their spin on the video at every single turn. For example, the defendants argue that Mr. Jennings took both hands off the wall and turned violently towards the officer, Fuller, while he was being frisked. The video does not show that. For example, they say that Mr. Jennings kicked him while he was on the ground. The video does not show that. The officers were standing on his legs in the initial takedown. They say that Mr. Jennings launched himself into the wall face-first. The video shows the officers picking up the handcuffed Mr. Jennings and propelling him into the wall face-first. They say that they fell. The video shows an officer putting his hand underneath Mr. Jennings' chin, pushing him through a doorway, and falling with his full 270 pounds on his head. When he comes up, you can see his face and eye are bleeding and swollen. These officers who are sued, are they jail officers, or some of them participate in the arrest originally? None of them. He was arrested by a Flint Township police officer. These are all Genesee County deputies. That other officer brought him to the jail and booked him for driving while intoxicated or under the influence. So these officers basically know nothing about him? They don't. Other than what is observable from his condition. Correct. And you can see in the video, there's an officer that's writing at the table. That's the arresting officer, Flint Officer Hartner, and he's writing his report for OWI. And at that time, Officer Fuller begins frisking him, taking his belt off, his sweatshirt, et cetera, and handing them to the other officer, Kenimer. You don't see, there was no warning given about Mr. Jennings' alleged propensity for violence. They knew nothing about him. So when his head turns. But they also knew nothing about the fact that he had cooperated or not during the arrest. Well, that is correct, Your Honor. But they also knew that when he came in the jail cell, he sat on the bench for quite a period of time and obeyed all directions when he was told to stand up, he did. When he was told to put his hands on the wall, he did. When he was told to spread his legs, he did. He was in a very vulnerable position. His legs are spread, his hands are out. He's in no position to attack a deputy. And, as you've noted, there's a huge disparity in the size. The officer that was frisking him is 270 pounds, Mr. Jennings is 140, in addition to all the other officers that eventually came. Now. Pepper sprayed and tased, and then this sack was put on his head. Yes, Your Honor. What was the purpose of that sack? Well, Your Honor, the pepper spray occurred while Mr. Jennings was being handcuffed during the initial takedown. It's not clear from the video if he was handcuffed or not. At the time he was pepper sprayed, there were two officers kneeling on him and an officer standing on his legs. So I would argue, I believe that Mr. Jennings was restrained at that point. He's locked in a jail. There's no use for the pepper spray. The tasering occurred after Mr. Jennings was taken in the safety cell. He was laying motionless, face down on the ground, handcuffed, with all these deputies surrounding him and one holding him on the ground. The lieutenant, Knuckles, decided to put him in a safety chair, or a restraint chair, pardon me, and he ordered the deputies to take Mr. Jennings, who was fully restrained at this point, in a cell, handcuffed, face down. And they yank him up, and Officer Fuller puts his hand over Jennings' mouth and nose, and Mr. Jennings has emphysema and had reasonably been pepper sprayed. And they took him out and threw him in a chair, and he's holding him. And you can see him struggle to breathe, his legs kick. And that's when Deputy Fuller said he was bit. He also said that he was spitting at the time. One of the deputies said he was spitting because he was pepper sprayed. That's one of the side effects. Another deputy said he's intentionally spitting at them. But that's why the mask came on. Put the thing over his head, the hook or whatever it is. It's a mesh mask that would deflect any spit coming out of a mouth so that you can't spit into a deputy's face. But it also impedes breathing, and Mr. Jennings was pepper sprayed. And despite the fact he was pepper sprayed, had emphysema, they strapped him face down and left him three hours without any treatment in a cell. And you can see, if you watch the video, the court has it, he struggles to breathe. He testified he chewed through the mesh and broke his teeth and lost consciousness at one point because he couldn't breathe. They're lucky they didn't kill Mr. Jennings during this. They piled on him. They had almost 1,000 pounds of man laying on top of him. When he was tasered, well, he was handcuffed. Judge Cohn certified this appeal as frivolous when he denied the motion for stay. And he said, as he noted, there's a factual dispute. And I want to get back to what Judge Gibbons said, that these facts are disputed. There's just no jurisdiction for this case to be here. The defendants have argued the facts in every turn. Now, with regard to whether the force was excessive, this circuit has a case called Cox v. Treadway, which says that when a person has been restrained, any use of force against them is plainly excessive. Now, Mr. Jennings was restrained on the floor in the report-writing room and handcuffed. At that point, any force that comes after that is plainly excessive. And the officers- So your position would be that a handcuffed person can't put up sufficient fight, that further restraint would be necessary? That's not what I'm arguing, Your Honor. I'll clarify if I implied that. What I'm saying is that at that point, Mr. Jennings has been pepper-sprayed, handcuffed, and is face down. He's in the control of the deputies. They pick him up and, by his arms, right back by his wrists, and bend his arms up. He suffered torn rotator cuff as a result of this beating, by the way, and propelled him into the wall face first. He suffered facial fractures on the side of the face that hit the wall. Now, I believe that's plainly excessive force, where he's held on the ground, he's surrounded by deputies, he's handcuffed, and had just been pepper-sprayed. At that point, he's clearly under control. There's no justification for picking him up. In the video, it's relatively clear that they pick him up and shoot him right into the wall. Defendant's version of the case is that he launched himself into the wall. That's clearly a contested fact for the jury, and for the purpose of this motion, or for the purpose of this appeal, should be taken in the facts and lie most favorable to Mr. Jennings. So, at that point, then, after he's done that, they have him handcuffed, two deputies hold his arms, and the third deputy bends his head back, and then they push him through the door and throw him on the floor, and he falls on top of him. That's plainly excessive, too. He's handcuffed, held by two deputies, he's a 140-pound man. Then they pick him up again, they put him in a safety cell, lay him down. He lays there virtually motionless, obeying all commands for a minute. It's very clear in the video he does not do anything except lay there. And then they pick him up, bend his arms back, put their hand over his mouth, and put him in the cell again. They try to put him into the restraint chair. And at that point, his legs kick out. He didn't kick at any deputies, his legs just flailed. And I submit that if you've been pepper-sprayed and someone's holding their hand over your mouth and nose, that that is an involuntary reaction at a minimum, and it's certainly reasonable under the circumstances. So, getting back to this Cox v. Treadway, what I was trying to argue is that when they picked him up and threw him against the wall, that's plainly excessive force. There's no justification for it. He's not posing a threat, and he's under their control. Now, with regard to the pepper spray, the pepper spray was administered while he was on the ground, hands were behind his back, two deputies on top of him, deputies standing on his legs. I submit that he's restrained at that point too. There's no need to use it. It's gratuitous force. It's done to punish him. Likewise, the taser. He's on the ground. There's a bunch of people kneeling on him. He's covered in pepper spray, and they taser him. There's a policy against tasering individuals at the Genesee County Jail who have been pepper-sprayed because they can catch on fire, and the lieutenant knew that, and he did it anyways. Of course, the violation of a policy isn't what we're here about. That's correct, Your Honor, but a violation of a policy can be some evidence that a constitutional violation occurred, so I'm not implying that that is a per se violation. With regard to the restraint bed, restraint beds are lawful, yes, under certain circumstances. However, it is plainly excessive force where you strap someone down who's been pepper-sprayed without providing any first aid to alleviate any of the effects of the pepper spray, someone who's told you he has emphysema, then cover him with a mask, and you can see them kneeling on him and ratcheting it down. Is there evidence he told them? There's evidence that he yelled out he has emphysema during the initial part. That's Mr. Jennings' testimony. How long was he left on that board? Approximately 3 hours, Your Honor. Just by himself in a cell, or was somebody with him? No, they put him into a cell, and they put him on the thing. They strapped him face down? Face down? Face down, Your Honor, with the mask on, and it's a, I don't know if you've ever seen an exhibit of that, but it's a fitted hard plastic thing, so your face goes right up against it. And then he has a mask on top of it, and then he's strapped in. He struggled to breathe, and he testified he lost consciousness as a result of his struggle to breathe and his emphysema. And they're supposed to, their policy, once again, which is not a constitutional violation, says they're supposed to check on people that are in these restraint beds. They're also supposed to administer first aid, wash off the pepper sprayer, put cool air on it. They did nothing. They just put him in the cell and left him there for 3 hours. Is there a policy, I mean, I realize that we're not here on policy, but I also realize that that can be indicative of an understanding on the part of the officers that what they're doing is perhaps a violation of constitutional rights. Is there a policy with regard to leaving people face down on one of those beds? There was not, Your Honor. The policy just talks about monitoring them. The bed is actually made to be put face down. I guess if a bed becomes necessary, then most likely it's safer for the officers to put a person face down. I don't think it's one or the other. I think it's designed to be put face down. Are they face down and handcuffed behind him? He was handcuffed face down. His hands behind him? No, actually, pardon me, I misspoke. His handcuffs are taken off and his hands are strapped to the bed. Yes. So they did unhandcuff him after his body was face down and he was strapped in. So he's in basically a four-point restraint face down. And you can see in the video, he struggles. When he's put into the room, he struggles to breathe.  And then he's motionless for a while. And then, ultimately, after about three hours, a team of officers comes in and he's removed from that without incident and gets some medical care at that time. He didn't get any medical care before he was put face down. So do you have any questions about the malicious prosecution claim at all? I don't think we do. Okay, I would like to point out that the defendants did not raise, defendants Kinnamer and Fuller did not raise a qualified immunity defense on the malicious prosecution claim in the district court. They've argued it in the court of appeals. And despite that argument being in front of the court of appeals, on April 20th, they filed a motion for qualified immunity on the malicious prosecution claim in the district court, since there's no stay, both the district court and the circuit court denied a stay. So we have it pending in both cases right now, both courts, which I think is highly unusual. And we filed a motion to strike that. But I thought it was important for the court to know that that is pending in both courts. I've never seen that before. So in closing, I'd ask that you would affirm Judge Cohn's decision or in the alternative find that the court lacks jurisdiction and dismiss the appeal. Thank you. Counsel? A couple of points on rebuttal. First of all, with respect to the disparity in size and the ongoing resistance, it is very clear that the fact that Jennings was not physically large did not impede him from continuing to resist and requiring the involvement of multiple deputies. One of the deputies testified he had never in his years on the force been in a circumstance where multiple officers were unable to restrain a noncompliant prisoner in a restraint chair, which would have been preferable had they been able to do it. And the video clearly reveals that. We went through the video point by point in our reply brief, and I think that should be of some assistance to the court in looking at the video. We are not here questioning facts, but we are here within the court's jurisdiction under both Scott v. Harris and the general rules of jurisdiction. We have accepted the plaintiff's facts, but keep in mind that the plaintiff says he has no memory after being pepper sprayed. So his testimony with respect to the initial incident would be relevant. But all of these assertions about what he said or what he was feeling or what he was thinking or whatever after have no basis in the record because by his own testimony he has no memory. And so what we're left with is the video, which we think is clear, and that's for the court to review and determine from your perspective. And the testimony of the various officers, which is consistent and which says this was an inmate who continued to resist, shout, flail out. Now, in the lower court, and again today, plaintiff wants to say, well, he was struggling to breathe and his flailing legs were inadvertent. The officers do not know, and there's no law that I'm aware of in this circuit or any other that holds an officer responsible for knowing if someone's arm is hitting out and leg is flailing out and they're spitting that the prisoner's motive was a good one and therefore they're not entitled to respond to the force that they perceive. And I think that's very important as the court approaches these issues. It seems to me that the pepper spray and the taser by themselves ought to quiet him down. As you say, he's still struggling and they have to put him on this restraining bed with a hood over his head. That's exactly true, and the officers were consistent in saying we tried to restrain him using relatively minor kinds of force. We tried to handcuff him. He continued to struggle. We tried then to use the pepper spray. He continued to struggle. We tried then to use the taser. It had no effect. He continued to struggle. This is an inmate, a prisoner, who is resisting actively, forcefully, to the degree that all of these officers are unable to get him in a restraint chair. And the video confirms that. So we have the officer's testimony, we have the video, we have his assertion that he doesn't remember after the pepper spray. It seems to me... Judge Cone thought that there was a fact question as to his memory, right? Yes. Judge Cone had a different view of the case. I think that's clear. I also want to just say with respect to the medical records and the medical evidence, and this is in the record, first of all, whatever medical evidence there is, that's not really relevant about what the officers did and what he did. It's after-the-fact evidence. Second of all, there's a question about the medical evidence. Some of the medical evidence, there was a test to determine fractures that showed no fractures the day after the incident. Then there was a later medical test that did not come from the subpoena from the medical records that showed a minor fracture, and that's somewhat inexplicable, but I wanted to draw the Court's attention to that. I don't think the medical records are relevant in any case. I'm happy to answer questions about... I have no questions. I think we have none. Thank you, Counsel. Thank you.